UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JARRETT WADE SWANIGAN,

        Petitioner,                  Civil No. 11-11833
                                              Honorable Patrick J. Duggan

v.

STEVEN RIVARD,

        Respondent,

_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY

Petitioner Jarrett Wade Swanigan ("Petitioner"), a Michigan Department of Corrections' prisoner, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner is challenging his convictions in July 2004, for first-degree murder in violation of Michigan Compiled Laws § 750.316, three counts of assault with intent to commit murder in violation of Michigan Compiled Laws § 750.83, and possession of a firearm in the commission of a felony in violation of Michigan Compiled Laws § 750.227b. For the reasons that follow, the Court denies Petitioner's request for habeas relief and a certificate of appealability.

## I. Factual and Procedural Background

Petitioner was convicted of the above offenses following a jury trial in the Circuit Court for Wayne County, Michigan, in which he was tried jointly with Erick Anthony Johnson. This Court recites verbatim the relevant facts relied upon by the trial court in

denying a post-conviction motion filed by Petitioner, which are presumed correct on

habeas review pursuant to 28 U.S.C. § 2254(e)(1):

Bashar Edwards, seventeen, was assassinated by a gunman in a drive by shooting as he left the Blight Busters Club on February 1, 2004. Edwards was shot four times, twice in the head, once in the shoulder and once in the back. The manner of death was homicide and the cause of death was multiple gunshot wounds.

Antoine Ayers and Fred Davis were also shot, but not killed, as they stood near Edwards.

Jennifer Ward hosted a party on February 1, 2004 at the Blight Busters Club located at 17405 Lahser in the City of Detroit. Johnson and Swanigan, members of the 8 Mile Group (gang) attended the party. Swanigan was with his girlfriend, Amber Beebe. Edwards, a member of the 7 Mile group, also attended the party. There was no reference made at trial to the term 'gangs'. The rival persons were identified or referred to only as 'groups.'

About 10:00 p.m., there were at least one, and maybe two, altercations inside the party between the 7 Mile and the 8 Mile groups. Johnson and Edwards were involved in that altercation. Johnson, and maybe Swanigan, was evicted after the fight, but Swanigan later returned inside the party. Johnson was still hyped (angry) about the fight. Johnson drove an older model gray Caprice.

Derrick Moore, Fred Davis, Martell Rucker and Dawan Rucker saw the shooting. They testified the gunshots came from a Caprice, which came down Lahser and stopped in front of the club. One person sat on the passenger window ledge of the Caprice with a shotgun and shot over the roof of the car four or five times. The driver of the car shot out his window of the Caprice with a handgun.

Both Martell and Dawan Rucker described the shooter(s) as a caramel or light skinned person with a short fade haircut in a blue and gray hoodie. Moore described one shooter's complexion as dark and that he wore a skull cap.

Antoine Ayers was outside the party (club) just before midnight. He was at the front door of the club when he heard at least ten gunshots. He was

2

struck in the chest by a bullet.

Ayers saw a white van, about two cars lengths in front of him, blocking the street.  There was a white van in the area with neon lights on it.  Ayers denied that any gunshots came from that van because if they did he would have been shot in the back, not in the front.

Kelvin Payne was a friend of both Johnson and Swanigan since he was in the 6th grade.  Payne denied he was a member of either group (gang) but admitted he had friends (including Johnson and Swanigan) in the 8 Mile group (gang).

Payne did not know Bashar Edwards or any of the other persons who were shot.

Payne came to the party at Blight Busters about 10 pm with Ike and Nate but they left without him.  He did not go inside the club because the line was too long.  Brandon Gilkey and Shorter were in a van across the street from the club in a liquor store parking lot.  Payne asked them if he could ride with them because he had no ride, and they consented.

Payne saw Johnson in the parking lot after the fight and Johnson was angry. Swanigan was outside in the parking lot.  Johnson said, "They was about to pop somebody."

Johnson drove up in a light blue or light green Caprice.  Swanigan was in a black Chevy Cavalier.  Swanigan and Johnson talked to each other.  They both drove their respective cars across the street.  Swanigan parked his car and got into the passenger seat of Johnson's car.  They stayed in that car until people came out of the club.  When Edwards came out of the club, Johnson pulled the car in front of the club.

Johnson shot out of the driver's window with a handgun.  Swanigan sat on the window sill of the passenger side of the car and shot over the roof with a shotgun.  There was a total of about ten or eleven shots fired between Swanigan and Johnson.

Payne left the party in the white van with Shorter and Gilkey after the shooting, but before the police arrived.  They went to the Coney Island at 8 Mile and Ryan.

3

Johnson and his brother were at the Coney Island. Swanigan was there with his girlfriend.

Payne heard Swanigan and Johnson talk about the shooting. Payne admitted there was a white van with neon lights a couple of car lengths behind the Caprice. There were a lot of people around the van and there may have been a gun in it.

Payne told his mother of the shooting by the defendants the night it occurred.

Henry [Petitioner's defense counsel] established there may have been a gun in the white van. She also established through David Soli, a Detroit Police Department Evidence Technician, that a handgun was found outside the Blight Buster Club.

Daniel Reed testified that the bullets and casings at the scene included 9 mm casings and bullets. The gun found behind the club was a revolver which had not been fired.

Dale Greenleaf went over the video tape which showed Johnson involved in a fight inside the club.

Swanigan called five witnesses. Southfield police officer Kassel James testified he observed a gun brandished from a white van on McNichols and Grand River on the same day as the shooting near the Blight Buster club. He notified Detroit police dispatch (made a report) of his observations.

Shalonda Spicer was riding past the Blight Busters club and saw a white van in the parking lot with a bunch of guys around it. She saw shooting coming out of that van and a person fall down. She went to the police precinct and reported her observations. She testified the shots clearly came from a white van.

Tara Stokes testified she did not know Johnson, nor Swanigan nor any of the victims. She was coming from a gas station and saw a white van at the Blight Busters Club doing 'donuts' in the street. Gunshots came from that white van towards people standing at the door of the Blight Buster.

Bernice Slaughter testified that Swanigan's hair style at the time of the offense was different from that in court, i.e. longer.

4

Vanice Ward, a Detroit police officer, was chaperoning the party at the Blight Buster Club. He searched the patrons for guns before they entered. He had no recollection of Swanigan. He did recall Johnson.

[Officer] William Zeolla testified he stopped a white cargo van with six occupants to search it for weapons. There were no weapons found in it and the occupants were released.

*People v. Swanigan*, No. 04-002842-02, at *3-9 (Wayne Cnty. Cir. Ct., Nov. 25, 2008) (internal citations and footnotes omitted).

After he was convicted and sentenced, Petitioner filed a direct appeal raising several grounds for relief. The Michigan Court of Appeals rejected almost all of Petitioner's claims, but remanded the matter to the trial court to conduct a *Ginther* hearing[1] with respect to Petitioner's claim that his counsel was ineffective in failing to call Brandon Gilkey as a witness. *People v. Swanigan,* No. 257144, 2005 WL 3505802 (Mich. Ct. App. Dec. 22, 2005). On remand, the trial court conducted an evidentiary hearing and then rejected Petitioner's ineffective assistance of counsel claim. *People v. Swanigan*, No. 04-2842-02-FC (Wayne Cnty. Cir. Ct., April 12, 2006). The Michigan Court of Appeals affirmed Petitioner's conviction after remand. *People v. Swanigan*, No. 257144 (Mich. Ct. App. May 5, 2006) (after remand). The Michigan Supreme Court denied Petitioner leave to appeal. *People v. Swanigan*, 477 Mich. 979, 725 N.W. 2d 336 (2006).

In 2008, Petitioner filed a petition for writ of habeas corpus in this court, which

---

[1]*People v. Ginther*, 390 Mich. 436, 443, 212 N.W. 2d 922 (1973).

was held in abeyance so that he could return to the state courts to exhaust additional claims. *Swanigan v. Ludwick*, No. 08-11309, 2008 WL 937492 (E.D. Mich. Apr. 7, 2008). Petitioner then filed a post-conviction motion for relief from judgment pursuant to Michigan Court Rule 6.500, which the trial court denied on November 25, 2008. *People v. Swanigan*, No. 04-002842-02 (Wayne Cnty. Cir. Ct., Nov. 25, 2008). The Michigan appellate courts denied Petitioner leave to appeal. *People v. Swanigan*, No. 295230 (Mich. Ct. App. Apr. 2, 2010), *leave denied*, 488 Mich. 1045, 794 N.W.2d 593 (2011).

Petitioner returned to federal court and filed an application for the writ of habeas corpus pursuant to § 2254 on April 26, 2011. Petitioner raises the following grounds in support of his request for habeas relief:

> I. Where Swanigan was represented by counsel and declined to stand in a lineup or be interviewed without counsel present, the prosecutor impermissibly elicited testimony and commented on Swanigan's exercise of his Fifth and Sixth Amendment rights, thereby depriving him of a fair trial and due process of law.
>
> II. Swanigan was deprived of his Sixth Amendment right to the effective assistance of counsel, when counsel failed to investigate and prepare for trial, failed to call witnesses, failed to object, and failed to present a viable defense.
>
> III. Swanigan was deprived of his Sixth Amendment right to the effective assistance of appellate counsel, when counsel failed to raise preserved and otherwise viable issues, and where counsel failed to support issues by citation to the record and authority, thereby effectively abandoning them.

Respondent has filed an answer to the petition for writ of habeas corpus.

## II. Standard of Review and Procedural Default

Review of this case is governed by the Antiterrorism and Effective Death Penalty

6

Act of 1996 ("AEDPA").  Pursuant to the AEDPA, Petitioner is entitled to a writ of

habeas corpus only if he can show that the state court's adjudication of his claims on the

merits-

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination
> of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the

state court arrives at a conclusion opposite to that reached by the Supreme Court on a

question of law or if the state court decides a case differently than the Supreme Court has

on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405-06,

120 S. Ct. 1495, 1519-20 (2000).  An "unreasonable application" occurs when "a state

court decision unreasonably applies the law of [the Supreme Court] to the facts of a

prisoner's case."  *Id*. at 409, 120 S. Ct. at 1521.  A federal habeas court may not "issue

the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly."

*Id*. at 410-11, 120 S. Ct. at 1522.

The Supreme Court has explained that "[a] federal court's collateral review of a

state-court decision must be consistent with the respect due state courts in our federal

system."  *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041 (2003).  The

7

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. – , –, 130 S.Ct. 1855, 1862 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7, 117 S. Ct. 2059, 2067 n.7 (1997); *Woodford v. Visciotti*, 537 U.S. 19, 24, 123 S. Ct. 357, 360 (2002) (per curiam)). "[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. –, –, 131 S.Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149 (2004)). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75, 123 S. Ct. 1166 (2003)). Furthermore, pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* "[I]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786.

Although 28 U.S.C. § 2254(d), as amended by the AEDPA, does not completely bar federal courts from relitigating claims that have previously been rejected in the state courts, it preserves the authority for a federal court to grant habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with" the Supreme Court's precedents. *Id.* Indeed, "Section 2254(d)

8

reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* (citing *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5, 99 S. Ct. 2781 (1979) (Stevens, J., concurring in judgment)).  Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.* at 786-787.

Respondent contends that Petitioner's first claim and a portion of his second claim are procedurally defaulted because Petitioner raised them for the first time only in his post-conviction motion for relief from judgment and failed to show cause and prejudice, as required by M.C.R. 6.508(D)(3), for failing to raise the claims on direct appeal.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729, 111 S. Ct. 2546, 2553 (1991). However, procedural default is not a jurisdictional bar to review of a habeas petition on the merits. *See Trest v. Cain*, 522 U.S. 87, 89, 118 S. Ct. 478, 480 (1997).  Additionally, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F. 3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525, 117 S. Ct. 1517 (1997)).  It may be more economical for the habeas court to simply review the merits of the petitioner's case,

9

"for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525, 117 S. Ct. at 1523.  In the present case, this Court believes that application of a procedural bar would not affect the outcome of this case, and the Court deems it more efficient to proceed directly to the merits.

### III.  Analysis

### A.  Petitioner's claim concerning the prosecutor's comments about Petitioner's refusal to participate in a lineup

In his first ground in support of his request for habeas relief, Petitioner alleges that the prosecutor violated his Fifth, Sixth, and Fourteenth Amendment rights by eliciting trial testimony from a detective that Petitioner refused to participate in a lineup and then commenting on Petitioner's refusal to participate in the lineup in his closing argument.

The Fifth Amendment privilege against self-incrimination applies only to compelled incriminating communications that are testimonial in character and therefore does not prohibit requiring a person to exhibit physical characteristics. *See U.S. v. Hubbell*, 530 U.S. 27, 34-35, 120 S. Ct. 2037, 2042-43 (2000).  Stated plainly, the Fifth Amendment does not prevent a defendant from being compelled to stand up in a physical lineup. *United States v. Wade*, 388 U.S. 218, 221-23, 87 S.Ct. 1926, 1929-30 (1967); *see also U.S. v. Harris*, 660 F.3d 47, 52 (1st Cir. 2011).  Because the Fifth Amendment is not implicated by a criminal defendant's appearance in a lineup, evidence of a defendant's refusal to appear in a lineup does not violate his right against self-incrimination. *See O'Brien v. Wainwright*, 738 F.2d 1139, 1143 (11th Cir. 1984); *see also U.S. v. Bullard*, 37

10

F.3d 765, 768-69 (1st Cir. 1994).

Petitioner further claims that the prosecutor's references to his refusal to participate in the lineup violated his right to due process under the Fourteenth Amendment because he already had been advised of his *Miranda* rights and thus believed he had the right to refuse to participate in the lineup. However Petitioner cannot argue that he refused to participate in the lineup based on any *Miranda* warnings given to him, because the Fifth Amendment right against self-incrimination does not apply to lineups and thus the *Miranda* doctrine has no applicability to the conduct of lineups. *See Kirby v. Illinois*, 406 U.S. 682, 688, 92 S. Ct. 1877, 1882 (1972).

Finally, the Court must reject Petitioner's claim that references to his refusal to participate in the lineup violated his Sixth Amendment right to counsel. An accused's right to have counsel present at a pre-trial identification procedure only attaches to lineups conducted at or after the initiation of adversarial judicial criminal proceedings. *Moore v. Illinois*, 434 U.S. 220, 226-27, 98 S. Ct. 458, 463-64 (1977). Because Petitioner had not yet been formally charged with any crime when there was the attempt to conduct a lineup in the case, there was no violation of his Sixth Amendment right to counsel. Moreover, there is no indication that the police refused to allow Petitioner's counsel to be present at the lineup.

For the above reasons, Petitioner is not entitled to habeas relief on his first claim.

### B. Petitioner' ineffective assistance of trial counsel claim

In his second claim, Petitioner contends that he was deprived of the effective

11

assistance of trial counsel.

To show that he was denied the effective assistance of counsel under federal constitutional standards, Petitioner must satisfy a two prong test.  First, he must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064 (1984).  In so doing, Petitioner must overcome a strong presumption that his counsel's behavior fell within the wide range of reasonable professional assistance. *Id*. at 689, 104 S. Ct. at 2065.  In other words, Petitioner must overcome the presumption that, under the circumstances, the challenged action "might be sound trial strategy."  *Id*.  Second, Petitioner must show that such performance prejudiced his defense. *Id*. at 687, 104 S. Ct. at 2064.  To demonstrate prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694, 104 S. Ct. at 2068.  "*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different," but for counsel's allegedly deficient performance. *Wong v. Belmontes*, – U.S. –, 130 S. Ct. 383, 390-91 (2009).

Pursuant to the standard of review set forth in § 2254(d)(1), a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner.  *Knowles v. Mirzayance*, – U.S. – , 129 S. Ct. 1411, 1420 (2009).  On habeas review, "[t]he question 'is not whether a federal court believes the state court's determination' under the

12

*Strickland* standard 'was incorrect but whether that determination was unreasonable– a substantially higher threshold.'" *Id.* at 1420 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 131 S. Ct. at 785.

> Stated differently:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel' s actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington*, 131 S. Ct. at 788. In addition, a reviewing court must not merely give defense counsel the benefit of the doubt, but must "affirmatively entertain the range of possible 'reasons . . . counsel may have had for proceeding as [he or she] did." *Cullen v. Pinholster*, – U.S. – , 131 S. Ct. 1388, 1407 (2011).

Petitioner first contends that his trial counsel was ineffective for failing to investigate or call several witnesses at trial. The state courts' evaluation of this claim was neither contrary to nor an unreasonable application of *Strickland*, nor was the evaluation based on an unreasonable determination of the facts.

Petitioner claims that his trial counsel was ineffective for failing to call Brandon Gilkey to refute Kelvin Payne's testimony that he had driven with Gilkey and Shorter to the Coney Island following the shooting. Petitioner submitted an affidavit from Gilkey in

13

support of his Standard 4 *pro per* brief on direct appeal.  In this affidavit, Gilkey states:

> 1. I was present with my friend Erick Shorter during the shooting that occurred on Lahser and Grand River on February 1, 2004 at the Motor City Blight Busters.
>
> 2. I arrived at the location at approximately 10:00 p.m. with Mr. Shorter in his white Astro van.
>
> 3. No one else was in the van besides myself and Mr. Shorter.
>
> 4. When a fight broke out inside the premises, I left the facility with Mr. Shorter.
>
> 5. I was inside the Astro van when the shooting took place in the parking lot.
>
> 6. That the shots came from individuals firing weapons from a White Utility van.
>
> 7. At that time, only myself and Mr. Shorter were in the van.
>
> 8. Although I knew Kelvin Payne from grade school, at no time did I see Kelvin Payne that night, and he was not in the van with myself and Shorter that night.
>
> 9. After the shooting we (myself and Shorter) drove to a Coney Island on East- 8 Mile and met up with Erick Johnson and Jarrett Swanigan.
>
> 10. I never heard Erick Johnson or Jarrett Swanigan admit to doing the shooting; nor did I ever see Mr. Swanigan pull a spent shell from his pocket.
>
> 11. Kelvin Payne was never present at the Coney Island during the time myself, Erick Shorter, Erick Johnson and Jarrett Swanigan was there.

(Pet.'s Reply Br. Ex. 2a.)  Gilkey also testified at Petitioner's *Ginther* hearing on

February 13, 2006.  The trial court summarized his testimony as follows:

> At the *Ginther* hearing Gilkey testified Johnson was not kicked out of the

14

party.  Gilkey left the front of the club with Shorter between 12:00 and
12:30.  There was a white van with a blue strobe light going across Lahser
that circled around.  He also saw about 15 Caprices.  He heard two muffled
shots as he was walking across Lahser.  He ran to the van and looked back.
He did not see who fired the shots.  He did see a white utility van with
several persons from Martin Luther King High School in it.  He assumed
the shots came from the van but did not actually see the shots.  He did not
see Swanigan at the time of the shooting.

Gilkey and Shorter left the scene alone and did not wait for the police.

Shorter drove a burgundy and white Astro van.  They went to the Coney
Island close to his house.  As they arrived, Swanigan, Beebe and Bernard
Scott also arrived.  Johnson was at the Coney Island with his brother Andre
Glass.

Gilkey got a carry out and left with Shorter.  He was there a total of ten
minutes.  There were about four other persons in the Coney Island when he
arrived, including two employees.

Gilkey has known Payne since grade school.  Payne was not there.  Gilkey
did not hear any discussion of the shooting.

Gilkey had no recollection if he was contacted by an attorney but he may
have been shortly before trial.

*Swanigan*, Op. and Order Denying Def.'s Mot. for a New Trial, No. 04-002842-02, at 22-

23 (Wayne Cnty. Cir. Ct. April 12, 2006).

The trial court rejected Petitioner's claim that his trial counsel was ineffective for

failing to call Gilkey, concluding that trial counsel made a professional judgment not to

call him as a witness and that this decision was not unreasonable because he was not a

credible witness.  The Michigan Court of Appeals affirmed, reasoning:

The remand hearing took place over four days. The trial court issued his
33-page opinion on April 12, 2006.  The trial court found that Gilkey's
testimony was inconsistent with his affidavit filed with this Court, that he is

15

not a credible witness, that defendant's trial counsel had contacted Gilkey but determined that his testimony was not relevant or helpful, and that defendant's trial counsel was not ineffective for not calling Gilkey as a witness.

*Swanigan*, No. 257144 (Mich. Ct. App. May 5, 2006).

Petitioner is not entitled to habeas relief on this ineffective assistance of counsel claim.  First, the trial court judge who conducted the *Ginther* hearing observed Gilkey's demeanor at the hearing and determined that he was not a credible witness.  Federal courts must give state court factual determinations a presumption of correctness that can be overcome only by clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).  In this case, there is no clear and convincing evidence to reject the trial court's credibility finding regarding Gilkey.  *See, e.g., Fargo v. Phillips*, 58 F. App'x 603, 607 (6th Cir. 2003).  The trial judge's determination that Gilkey would not have made a credible witness was reasonable for the reasons stated by the judge in his lengthy opinion. *See Swanigan*, Op. and Order Denying Def.'s Mot. for a New Trial, No. 04-002842-02, at 5-6, 8, 25-26 (Wayne Cnty. Cir. Ct. April 12, 2006).

Under *Strickland*, a court must presume that a trial attorney's decisions whether to call or question witnesses are matters of trial strategy. *See Hutchison v. Bell*, 303 F.3d 720, 749 (6th Cir. 2002).  Because Gilkey's credibility could have been called into question on a number of points had he testified, counsel was not ineffective in failing to call him as a witness. *See Smith v. Jago,* 888 F.2d 399, 409 (6th Cir. 1989); *Randle v. Jackson*, 544 F. Supp. 2d 619, 633 (E.D. Mich. 2008).  Moreover, Gilkey's proposed testimony would have contradicted the testimony of William Dorsey and Johnson's

16

brother, Andre Glass, who testified that they saw Payne at the Coney Island when Petitioner and Johnson were there.  Counsel was not ineffective for failing to call a witness who would have contradicted the testimony of another witness for the defense. *See Pillette v. Berghuis,* 408 F. App'x 873, 887 (6th Cir. 2010).

Petitioner also contends that trial counsel was ineffective for failing to call Amber Beebe, Martha Swanigan (Petitioner's mother), Erick Shorter, and/or Bernard Scott to testify at trial.  The state trial court rejected Petitioner's claim because these individuals proffered testimony that would not have aided and/or in fact would have hindered Petitioner's defense.

With respect to Beebe's proposed testimony, as the trial court indicated in rejecting Petitioner's claim:

> She [Beebe] was not called as a witness at the trial, but her testimony at the *Ginther* hearing is, to understate the case, of no help to Swanigan.  Her description at the hearing of Swanigan's comings and goings at the party and just before the shooting could very well have suggested to the jury that Swanigan left the hall early to meet Johnson to be prepared for the crowd coming out of the club.  She puts Swanigan outside the hall before the party was over with no explanation of why he left; why he gave her the keys to his car and disappeared before the shooting; reappeared after the shooting; told her to drive to a given location, where he rejoined her in his car– all without explanation.  They then proceed to the Coney Island.  She had nothing to say in the hearing as to whether Payne was or was not at the Coney Island.  Though she was present at the Coney Island that night with Swanigan, significantly she did not contradict the trial testimony of Payne's[] presence or what Payne saw or overheard, nor was she asked to.

*Swanigan,* Op. and Order Denying Def.'s Mot. for a New Trial, at 7-8 (Wayne Cnty. Cir. Ct. April 12, 2006).

17

As the trial court correctly noted, Beebe did not provide any testimony that could have exculpated Petitioner.  The only significant testimony that Beebe could offer was that Petitioner was not a member of the "8 Mile Group."  Because this was not an exculpatory point, counsel was not ineffective for failing to call her. *See Millender v. Adams,* 376 F.3d at 527.

With respect to Petitioner's mother, her testimony from the *Ginther* hearing provided no exculpatory evidence.

With respect to Shorter and Scott, Petitioner did not present their affidavits to the state courts during his direct appeal, nor did he call them to testify at the *Ginther* hearing. Petitioner submitted their affidavits for the first time with his post-conviction appeal following the denial of his motion for relief from judgment.  Petitioner has attached Shorter's and Scott's affidavits to his reply brief here.

There are several problems with their affidavits.  First, neither was notarized and therefore the Court has no way of determining their authenticity. Second, Shorter and Scott did not allegedly sign these affidavits until September 2009, long after Petitioner's trial and four years after he filed his Standard 4 *pro per* brief on direct appeal.  Petitioner offers no explanation as to why they did not provide their affidavits sooner.  A federal court "may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence." *Schlup v. Delo*, 513 U.S. 298, 332, 115 S. Ct. 851, 869 (1995).  Although Petitioner claims that appellate counsel was ineffective for failing to raise this claim on direct appeal, Petitioner has offered no

18

explanation why he himself did not provide the affidavits when he filed his own *pro per* Standard 4 brief on appeal.

Finally, the proposed testimony from these individuals suffers from many of the same defects as Gilkey's and Beebe's proposed testimony.  Neither Shorter nor Scott actually saw who fired the gunshots, so neither could conclusively exonerate Petitioner. Notably, Scott states in his purported affidavit that Petitioner was not with him when the gunshots went off.  Thus his testimony, like Beebe's, would not rule out Petitioner as being involved in the actual shooting.  Shorter provides several statements in his affidavit that contradict the testimony of witnesses who were called by Petitioner or his co-defendant at trial.

Petitioner next claims that his trial counsel was ineffective for failing to object to the admission of Payne's statement to his mother, Lannie Payne, on the ground that the statement should be excluded pursuant to Michigan Rule of Evidence 801(d)(1)(B) because it was made after the opportunity to fabricate had arisen.  Lannie Payne testified that her son returned home on the night of the shootings and identified the defendants as the shooters.  Although Petitioner's counsel and co-defendant's counsel objected to the admission of this testimony, they did so on a different basis.  As a result, the Michigan Court of Appeals found that the claim was unpreserved and reviewed it for plain error only.

The Michigan Court of Appeals agreed that it was error to admit Lannie Payne's testimony because her son's statement to her was made after he had a motive to fabricate.

19

The court nevertheless determined that the error did not require reversal because it did not likely affect the outcome of the proceedings. The court reasoned that Lannie Payne's testimony was "weak" and she was "obviously biased," identifying several basis for this finding:

> she was obviously potentially biased because she was Kelvin's mother; the jury was aware that Lannie had not been scheduled to testify until after she listened to Kelvin's testimony on the first day of trial; and, most significantly, Lannie never stated defendants' names when asked if Kelvin had told her the names of the shooters. She merely attested that Kelvin said "the name he called yesterday at trial."

*Swanigan*, No. 257144, at *7 (Mich. Ct. App. Dec. 22, 2005). The Michigan Court of Appeals further noted that there was little evidence of Payne's involvement in the shooting and thus little motive to falsely implicate Petitioner. *Id*.

Thus even if counsel was deficient in failing to assert the proper objection to Lannie Payne's testimony, Petitioner is unable to show that he was prejudiced by this alleged error.

Petitioner next contends that trial counsel was ineffective for failing to object to the admission of evidence and argument by the prosecutor concerning his refusal to participate in a lineup. The Court already has determined that it was not improper for the prosecutor to refer to Petitioner's refusal to participate in the lineup. Petitioner therefore cannot establish that counsel was ineffective for failing to object to these references.

Petitioner next contends that trial counsel was ineffective for failing to object to evidence that witnesses had been threatened or intimidated. Petitioner, however, does not

specify the nature of this testimony or offer any argument as to why such testimony was improper.  Conclusory allegations of ineffective assistance of counsel, without any evidentiary support, do not provide a basis for habeas relief. *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998).  Moreover, a prosecutor who in good faith believes that a witness has been threatened or intimidated to change his testimony is permitted to question that witness whether he has been intimidated. *See U.S. v. Thomas*, 875 F.2d 559, 562 n. 2 (6th Cir. 1989).  Evidence that a defendant threatened a witness is generally admissible, because it is probative of the defendant's consciousness of guilt. *United States v. Fortson*, 194 F.3d 730, 737 (6th Cir. 1999); *People v. Abernathy*, 153 Mich. App. 567, 573, 396 N.W.2d 436 (1985).  Threats to a witness are also relevant to assess the credibility of that witness.  *Dorchy v. Jones*, 320 F. Supp. 2d 564, 578 (E.D. Mich.  2004) (citing *United States v. Pierson*, 121 F.3d 560, 563 (9th Cir. 1997)).

Finally, Petitioner claims that his trial counsel was ineffective for failing to object to the prosecutor's references to Petitioner's involvement in the "8 Mile Group" on the ground that it suggested Petitioner was involved in a gang.

Petitioner did not raise this claim on direct appeal, although his co-defendant, Johnson, did.  The Michigan Court of Appeals rejected Johnson's claim, finding that such evidence was relevant to establish a motive for the shooting and that any prejudice resulting from the reference to Johnson's involvement in the "8 Mile Group" was not unfair, in that "other evidence of the 8 Mile group's general character or wrongdoings from which the jury could draw irrelevant conclusions was conspicuously absent" and the

21

prosecutor specifically indicated in his opening remarks that he was not suggesting that the 8 Mile Group was an actual gang. *Johnson,* No. 257145, 2005 WL 3505802, at *4-5 (Mich. Ct. App. Dec. 22, 2005). Based on the appellate court's determination, Petitioner is not able to establish that he was prejudiced by counsel's failure to object to the alleged misconduct. *See Finkes v. Timmerman-Cooper*, 159 F. App'x 604, 611 (6th Cir. 2005); *Campbell v. United States*, 266 F. Supp. 2d 587, 589-90 (E.D. Mich. 2003).

### C.  Petitioner's claim that his appellate counsel was ineffective

In his third claim, Petitioner contends that appellate counsel was ineffective for failing to raise or for failing to properly raise in his direct appeal the first and second grounds asserted above.

The Sixth Amendment guarantees a defendant the right to the effective assistance of counsel on direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97, 105 S. Ct. 830, 836-37 (1985). However, court appointed counsel does not have a constitutional duty to raise every nonfrivolous issue requested by a defendant. *See Jones v. Barnes*, 463 U.S. 745, 751, 103 S. Ct. 3308, 3312; 77 L. Ed. 2d 987 (1983). Ineffective assistance of counsel claims concerning appellate counsel, like those concerning trial counsel, are subject to review under the *Strickland* standard. *See Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005).

This Court has determined already that Petitioner's first and second claims are without merit. Therefore, Petitioner's appellate counsel cannot be found ineffective for

failing to raise those claims. *Shaneberger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)). Petitioner is not entitled to habeas relief on his ineffective assistance of appellate counsel claim.

### IV. Conclusion and Certificate of Appealability

For the reasons set forth above, the Court concludes that Petitioner is not entitled to habeas relief pursuant to § 2254 based on the grounds asserted in his petition. To the extent Petitioner intends to appeal this Court's decision, he must first obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A).

Section 2253 provides that a certificate of appealability may issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When a district court denies a habeas petition on the merits of the claims presented, a certificate may issue if the petitioner demonstrates that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604 (2000). This Court has evaluated Petitioner's claims on the merits. It cannot conclude that jurists of reason would find the correctness of its assessment of Petitioner's claims debatable.

Accordingly,

**IT IS ORDERED**, that Petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**;

**IT IS FURTHER ORDERED**, that Petitioner is not entitled to a certificate of appealability.

23

Dated: October 31, 2012                    s/PATRICK J. DUGGAN
                                           UNITED STATES DISTRICT JUDGE

Copies to:
Jarrett W. Swanigan, #503492
St. Louis Correctional Facility
8585 N. Croswell Road
St. Louis, MI 48880

AAG Laura Moody

24